UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:                                          Chapter 11

SONJA TREMONT-MORGAN, *et al.*,                 Case No. 10-16132 (SCC)

                        Debtors.                Substantively Consolidated
-----------------------------------------------------------x

## DISCLOSURE STATEMENT
## PURSUANT TO 11 U.S.C. §1125

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR BANKRUPTCY COURT APPROVAL, BUT HAS NOT YET BEEN ACTUALLY APPROVED.

Sonja Tremont-Morgan (hereinafter "Sonja") for herself and together with co-debtor Stam LLC ("Stam NY") (collectively the "Debtors"), hereby submit this Disclosure Statement (the "Disclosure Statement"), pursuant to §1125 of Title 11, United States Code (the "Bankruptcy Code"), in connection with the accompanying Debtors' joint plan of reorganization of even date (the "Plan").

## INTRODUCTION

The Plan establishes a protocol for marshalling and liquidating Sonja's assets, so that she can satisfy in full the judgment obtained against her by Hannibal Pictures, Inc. ("Hannibal") in the total amount of $7,066,294 (the "Hannibal Judgment"), as well as the other allowed claims, but at the same time in a manner which preserves for last Sonja's most necessary and cherished asset, her Manhattan residence at 162 E. 63rd

St., New York, NY (the "Manhattan Residence"), where she resides with her ten-year old daughter.

Indeed, the lynchpin of the Plan is the establishment of a well-defined hierarchy for the liquidation of assets, leaving the Manhattan Residence to the very end as may be necessary. It is significant that Sonja believes her other assets are sufficient to pay all allowed claims without resort to the Manhattan Residence. By establishing a defined order for the liquidation of assets, and fixing reasonable deadlines, Sonja believes that the Plan strikes a proper balance of her rights with those of creditors. Additionally, the Plan takes into account the need for Sonja to have time to conclude litigation with her former spouse, John Adams Morgan ("J.A. Morgan") in order to liquidate many of her assets.

These assets are described throughout, and include (i) a 99.6% interest in Stam New York, which owns the Manhattan Residence[1]; (ii) a 50% interest in Stam Colorado LLC ("Stam Colorado"), which owns real property in Telluride, Colorado (the "Telluride Property"); (iii) a 99.99%[2] interest in Stam SCI ("Stam France"), which owns real property in Ramatuelle, France (the "French Property"); (iv) the $3.0 million cash award owed to Sonja by J.A. Morgan (the "Lump Sum Payment"); and (v) anticipated

---

[1] The remaining 0.4% interest is held by Sonja's daughter, who lives with her at the Residence.
[2] The remaining 0.01% interest is held by J.A. Morgan because it was understood at the time that applicable law required Stam France to have two equity holders, so J.A. Morgan was designated with the least possible interest imaginable, and has no actual economic interest in Stam France or the French Property.

cash of approximately $1,000,000 held by Stam NY, as of the Effective Date (the "Bank Account Funds").

The proposed order for the liquidation of Sonja's assets, with a projected net recovery of Sonja's respective interest, is as follows:

| | | Anticipated Amount Available for Plan Based on Projected Net Equity[3] |
|---|---|---|
| 1 | Immediate payment of one-half of the Bank Account Funds into the Creditor Escrow as defined below; | $ 500,000 |
| 2 | Remittance of the Lump Sum Payment upon receipt; | $ 3,000,000 |
| 3 | Disposition of the Telluride Property based on a sale under 11 U.S.C. §36 3(h); | $ 1,500,000 |
| 4 | Disposition of the French Property, based upon either a sale or release of the corresponding escrow; and | $ 3,000,000 |
| 5 | Disposition of the Manhattan Residence as a last resort, through a refinance or sale. | |

Total projected value (excluding Manhattan Residence): $8,000,000

**LEGAL JUSTIFICATION FOR MARSHALLING OF ASSETS**

Although Hannibal alleges to have a perfected judgment lien against the Manhattan Residence, Sonja disputes this, and maintains that her home is unencumbered by any liens. However, even if Hannibal or any of the other creditors were to perfect a judgment lien against the Manhattan Residence, state law principles relating to judgment

---

[3] These amounts represent good faith estimates and actual amounts will depend on subsequent sales and collections.

enforcement, recognize that judgment creditors can be compelled to seek enforcement against other assets before the judgment debtor's home is subjected to levy, execution or sale. Indeed, the case law which has developed under CPLR 5206(e) and 5240 cautions that the courts should consider whether there are other means of satisfying a judgment short of a homestead sale. For example, it has been stated that "[s]equestration and sale of defendant's home is a drastic remedy which should be directed only when it is absolutely necessary and appropriate." Sojka v. Sojka, 542 N.Y.S.2d 456 (4th Dep't 1989). In another case, it was explained that:

> CPLR 5240 grants the courts broad discretionary power to alter the use of procedures set forth in article 52 including restraining impending sales of real property on the ground that creditors could resort to less intrusive means to satisfy judgments.

Sweeney, Cohn, Stahl & Vaccaro v. Kane, 822 N.Y.S.2d 632, 633 (2d Dep't 2006).

These state law principles, which would otherwise come into play outside of bankruptcy, provide the underpinnings to the marshaling aspects of the Plan, and hopefully will resonate here, before a court of equity. Thus, efforts to liquidate Sonja's other assets will begin immediately, and all net proceeds will be deposited into a special creditor escrow fund established in the Plan, including a cash payment of $500,000 on the Effective Date of the Plan.

## REPRESENTATION AND SCOPE OF THIS DISCLOSURE STATEMENT

This Disclosure Statement has been prepared by Sonja in consultation with her attorneys Goldberg Weprin Finkel Goldstein LLP. Sonja believes that this Disclosure

4

Statement contains the most current information available regarding her properties, mortgage obligations and sale prospects. Approval of the Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation by the Court as to the overall merits of the Plan and creditors should review the Plan independently.

## **CONFIRMATION OF THE PLAN**

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan, on _____, 2011 at 10:00 a.m., prevailing New York time, before the Honorable Shelley C. Chapman, Courtroom 610, United States Bankruptcy Court, One Bowling Green, New York, NY 10004.

All objections to confirmation must be in writing and filed with the Clerk of the Bankruptcy Court through the Court's Electronic Case Filing System and served upon Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, New York 10036, attention: Kevin J. Nash, Esq., with a courtesy copy delivered to the Hon. Shelley C. Chapman, United States Bankruptcy Court, One Bowling Green, New York, NY 10004 so as to be received on or before _____, 2011.

**Voting**. In accordance with section 1126(f) of the Bankruptcy Code, only classes of claims that are impaired under the Plan may vote to accept or reject the Plan. A class of claims is impaired if the Plan modifies, alters or changes the claimant's legal, equitable or contractual rights against the Debtor. In this case, Sonja has designated all claims as unimpaired, and thereby ineligible to vote, because the Plan contemplates that

all allowed claims will be paid in full under the Plan. Therefore, Sonja will not be soliciting actual votes on the Plan, although she is circulating a Disclosure Statement so that creditors have sufficient information to file possible objections to the Plan in conjunction with the confirmation hearing.

## SIGNIFICANT EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A. The Hannibal Litigation

Sonja's resort to Chapter 11 is a direct and immediate response to the adverse verdict in the litigation with Hannibal. Sonja's involvement in the motion picture business proved to be a terrible mistake, and in retrospect something she was not experienced enough to pursue. Sonja will have the rest of her life for regrets, but the cold facts are that in 2006, Hannibal sued Sonja in the United States District Court for the Southern District of California for damages arising out of a failed movie project. A jury ultimately reached a verdict that Sonja misrepresented available financing for the project and awarded a judgment for approximately $7 million in damages, even though it was highly speculative that the proposed movie would be profitable. After an appeal of the Hannibal Judgment to the Ninth Circuit Court of Appeals, the verdict was recently affirmed, leaving Sonja with a debt to Hannibal of approximately $7,000,000 to be addressed in this bankruptcy case.

### B. The Divorce

While the litigation with Hannibal proceeded, after ten years of marriage, an action for divorce (the "Divorce Proceeding") was commenced by J.A. Morgan in the

Superior Court of Connecticut, Judicial District of Stamford/Norwalk on January 14, 2006. The Court issued a memorandum decision on April 18, 2008 (the "April Decision") granting the divorce and dividing up the marital property, with Sonja receiving the following key assets:

- her 99.6% interest in Stam New York, which owns the Manhattan Residence[4];

- a lump sum payment from J.A. Morgan in the amount of $3 million (the "Lump Sum Payment") pursuant to a pre-nuptial agreement;

- her 99.99% interest in Stam France and the French Property;

- various bank accounts that were consolidated in the Debtor-in-Possession accounts maintained by Sonja, estimated to have a balance of approximately $1,000,000 as of Confirmation (the "Bank Account Funds"); and

- her 50% interest in Stam Colorado and the Telluride Property.

(Collectively, the Lump Sum Payment, and Sonja's interests in the Telluride Property and the French Property are the "Non-Manhattan Residence Assets").

Following the April Decision, Sonja filed a motion for clarification on May 8, 2008. A memorandum decision granting that motion was issued on October 17, 2008 (the "October Decision"). A motion for further clarification was then filed, and on July 28, 2009, the Court entered an Order Clarifying its prior order (the "July Order") (collectively, the April Decision, the October Decision and the July Order are the "Divorce Decree"). Copies of the documents making up the Divorce Decree are

---

[4] The remaining 0.4% interest is held by Sonja's daughter, who lives with her at the Residence.

available for review by creditors upon receipt of a written request to the undersigned counsel for Sonja.

Significantly, an appeal of the Divorce Decree was filed by J.A. Morgan, which triggered various stays of enforcement, so that the final disposition of Sonja's interests in the marital assets has not been implemented. Great effort will be devoted in the coming months to accelerate receipt of the marital assets, so that they can be liquidated for purposes of the Plan to generate the anticipated pool of approximately $8 million.

For example, as part of its findings, the Divorce Court determined that Sonja's 99.99% membership interest in Stam France was gifted to her by J.A. Morgan, making Sonja the rightful owner of the French Property. While J.A. Morgan previously instituted a lawsuit in France to collaterally challenge the ruling by the Divorce Decree that the gift to Sonja was proper, the French Court has since stayed that action in light of Sonja's Chapter 11 filing. Accordingly, J.A. Morgan remains subject to the dictates of the Divorce Court, which also ruled that J.A. Morgan is required to place the value of Sonja's 99.99% interest in the French Property in escrow (the "French Escrow"), with interest as of April 18, 2008.

The specific amount of the French Escrow, however, is dependent on an appraisal of the French Property being made, which heretofore J.A. Morgan has impeded and prevented from occurring. Such action is believed to be violative of the automatic stay, since J.A. Morgan is improperly exercising control over the French Property which

Sonja owns. In conjunction with the Plan, Sonja has filed a motion to obtain access to the French Property to make the appraisal, which will facilitate disposition of the French Property through sale, or release of the French Escrow to her.

## **SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE**

Sonja filed her Chapter 11 with high hopes that she would be successful in her appeal and a related malpractice claims against the attorneys who represented her at the trial with Hannibal. On March 10, 2011, a consensual order was entered lifting the automatic stay to permit the appeal to proceed. Special litigation counsel, Clifford Chance US LLP, was retained pursuant to Order dated March 14, 2011 to handle the appeal. Oral argument was held on April 15, 2011, and the Circuit Court rendered its ruling affirming the jury verdict on May 11, 2011.

In a parallel proceeding, Sonja also asserted malpractice claims against her former attorneys in California. These claims became subject to a commercial arbitration proceeding before JAMS, based upon the terms of the Sonja's underlying retention agreement. By Order dated February 2, 2011, the law firm of Kozberg & Bodell was retained by Sonja to continue their representation of her in the arbitration on a contingency fee basis. After a failed mediation and a lengthy trial, the arbitrator ruled in favor of the attorneys and denied Sonja any recovery.

In the aftermath, however, further issues arose as to Sonja's special counsel's receipt of $75,000 for expenses incurred in connection with the arbitration.

These monies were refunded, and special counsel has now moved for allowance of the expenses on notice to all creditors. All told, however, Sonja incurred over $200,000 in total expenses in connection with the arbitration for such things as expert fees, court stenographers and arbitration fees.

More disappointingly, Munger Tolles & Olson LLP, counsel representing Sonja's former attorneys, recently filed a motion with JAMS for an award of more than $1,600,000 in legal fees incurred in defending the arbitration. Sonja has disputed that counsel has any entitlement to fees, and advised that the motion was barred by the automatic stay. Sonja intends to contest any claim for fees that may be filed in her Chapter 11 case, based upon the fact that is no valid reason to disregard the standard American rule that each side bears it own fees in an arbitration proceeding absent an agreement for fee shifting, which does not exist here.

To round out the picture, because the Manhattan Residence is owned by Stam New York, a separate voluntary petition was filed by Stam New York on January 10, 2011. After a motion by Hannibal, the Debtors consented to substantively consolidate the respective cases, so that the assets and liabilities of both Stam New York and Sonja will be treated jointly for all purposes, including this Plan.

## CLASSIFICATION OF CLAIMS UNDER THE PLAN

The Plan classifies the various claims separately as set forth below. Administrative Expenses are not separately classified under the Plan and shall be paid in full as allowed by the Bankruptcy Court. Administrative Expense Claims consist of

professional fees and expenses incurred by Sonja's bankruptcy counsel, Goldberg Weprin Finkel Goldstein LLP, and other additional professionals who are retained by her during the Chapter 11 case. This will likely include her counsel in the divorce proceeding once the appraisal of the French Property is obtained. Such fees and expenses remain subject to Bankruptcy Court approval after application and additional notice to creditors. Total professional fees and expenses for Sonja's bankruptcy counsel are projected to amount of approximately $200,000.

Sonja's regular living expenses shall be paid from her income and part of the Bank Account Funds, without formal treatment under the Plan.

### Class 1: American Home Mortgage Servicing, Inc.

**Classification** – Class 1 consists of Sonja's one-half (1/2) share of the liability, if any, owed to American Home Mortgage Servicing, Inc. as servicer for U.S. Bank National Association, as Trustee for Zuni Mortgage Loan Trust 2006-OA1, Mortgage Pass-Through Certificates, Series 2006-OA1 ("Zuni"). Zuni filed a proof of claim in the amount of $7,359,449.50, and purports to hold a first mortgage lien covering Telluride Property by virtue of a deed of trust issued in connection with a prior $7 million refinancing which closed in 2006. Under the Divorce Decree, Sonja and J.A. Morgan are each responsible to pay half of this indebtedness.

The original note and deed of trust were executed by Sonja and J.A. Morgan with American Home Mortgage Acceptance, Inc., and purportedly assigned to

Zuni. The proof of claim contains an incomplete or defective endorsement of the underlying Note. The purported assignment of the Mortgage likewise appears incomplete or defective, as it is executed by MERS, and not American Home Mortgage Acceptance, Inc. and assigns the Mortgage without the Note. Moreover, there are no documents attached to the proof of claim which establish the power of American Home Mortgage Servicing, Inc. to file the proof of claim on behalf of Zuni. In light of these and other similar issues, the Debtor reserves all rights to review and analyze the documents supporting the proof of claim and object to the claim, through an appropriate motion at a later date.

**Treatment** – To the extent that Zuni's claim is deemed allowed in whole or in part, Sonja's 50% share of the liability will be paid in conjunction with the subsequent sale of the Telluride Property that Sonja is seeking to pursue based on a separate adversary proceeding. Presumably J.A. Morgan shall pay his one-half share of the claim from the proceeds of the sale. If an objection to the claim is pending at the time of the sale, Sonja will escrow her one-half share of the liability in a separate escrow account to be maintained by her counsel as Disbursing Agent, and paid over to Zuni in the event its claim becomes allowed.

**Voting** – By virtue of the proposed payment in full of Sonja's share of any allowed claim of Zuni, Zuni is unimpaired under the Plan.

**Anticipated Value** – The Telluride Property consists of two lots totaling 70 acres, improved by a two-story six bedroom home. The lot with the house was appraised

in 2005 as having a value of $9.5 million. The additional unimproved lot adds value by acting as a privacy buffer, and Sonja believes that the Telluride Property will sell for $10 million or more, given its condition and location in a desirable area of Colorado.

### Class 2: Credit Foncier de Monaco

**Classification** – Class 2 consists of the claim of Credit Foncier de Monaco ("Foncier"), which purports to hold a first mortgage lien covering the French Property by virtue of a note and mortgage in the amount of approximately $1,340,000 (the "Foncier Mortgage"). As a further security, Foncier is also in possession of a cash collateral account with at least €1,069,956.40 ($1,543,305) as of March 31, 2011 (the "Cash Collateral Account"). The Cash Collateral Account provides the primary source for repayment of the Foncier Mortgage, effectively freeing up the French Property to Sonja, to utilize for payment to creditors under this Plan.

**Treatment** – The Class 2 Mortgage Claim of Foncier shall be paid upon the Effective Date through release of the Cash Collateral Account, with any deficiency to be paid by Sonja upon sale of the French Property or release of the French Escrow to her. Notwithstanding the foregoing, Sonja reserves the right to object to the claim of Foncier, or its assigns, after review of all of the documents supporting such claim.

**Voting** – By virtue of the proposed payment in full of the allowed claim of Foncier, Foncier is unimpaired under the Plan.

**Anticipated Value** – Although there have been great problems in gaining access to the French Property for the purposes of conducting an appraisal, as discussed above, Sonja believes that the value of the French Property as of 2008 was approximately $3 million.

### Class 3: Unsecured Claims

**Classification** – Class 3 consists of Allowed Non-Insider Unsecured Claims, the most prominent of which is the Hannibal Judgment in the original sum of $7,066,294. Even though reduced to judgment, the claim of Hannibal is unsecured, since Hannibal never actually levied on of Sonja's assets prior to bankruptcy. Hannibal's issuance of restraining notices and/or commencement of turnover proceedings does not confer a secured status as a matter of state law.

Besides Hannibal, Sonja has other undisputed unsecured debts of approximately $250,000 owed to pre-bankruptcy attorneys in California (Clifford Chance USA LLP) and Connecticut (Lax & Truax).

Class 3 also includes the highly disputed claim of approximately $647,000 asserted by Donald Barton in connection with legal services alleged to have been performed for Sonja's production company as part of the movie deal with Hannibal. An action commenced by Mr. Barton in the United States District Court in Los Angeles has been stayed. Sonja disputes the validity of the claim and will file objections should a formal proof of claim be filed with the Bankruptcy Court.

Likewise, as discussed above, Sonja will oppose any claim asserted by Munger Tolles & Olson LLP for legal services rendered defending the malpractice arbitration. As noted above, the motion filed in the arbitration for approval of these fees has been stayed. Sonja will oppose any proof of claim that may be filed with the Bankruptcy Court for these fees.

A formal bar date for the filing of proofs of claim will be established by the Bankruptcy Court pursuant to separate order.

**Treatment** – All Class 3 creditors shall receive a dividend equal to 100% of their Allowed Claims together with interest at the federal judgment rate. This dividend shall be paid from the Creditor Escrow as funds become available, under the terms and conditions set forth in Article IV, or under such terms as the parties may agree upon.

**Voting** – Because Class 3 claims are being paid in full with interest, they are being classified as unimpaired.

## MEANS FOR IMPLEMENTATION OF THE PLAN

Sonja has given careful thought to her funding obligations, and will proceed quickly to jump start the process as noted above by commencing an adversary proceeding against J.A. Morgan seeking a declaratory judgment deeming J.A. Morgan and Sonja as joint owners of the Telluride Property, so that Sonja, exercising her rights as debtor-in-possession can sell the Telluride Property free of the interest of J.A. Morgan, as co-owner. Sonja is confident that a buyer can be located and a sale would net her

approximately $1.5millon. Likewise, it is Sonja's expectation that the future disposition of the French Property will generate additional proceeds of approximately $3 million, and that J.A. Morgan will start to deal with these matters if he is actually forced to establish the escrow.

Although J.A. Morgan continues to use the pending appeal as an excuse to withhold the Lump Sum Payment of $3 million, it should be noted that on June 10, 2008 Sonja filed a motion to terminate any stay as it relates to the Lump Sum Payment. This motion was argued in October, 2008, and apparently remains pending before the appeals court without decision. Sonja intends to renew the motion and supplement it with additional facts related to the bankruptcy and her urgent need to gain access to the Lump Sum Payment for Plan purposes.

Finally, the Manhattan Residence shall only be used to satisfy claims, whether through refinancing, or as an absolute last resort, via sale, in the event that the liquidation of the Non-Residence Assets is insufficient to pay creditors. Sonja shall have a period of one year from the Effective Date to complete the liquidation of the Non-Manhattan Residence Assets and collection of the Lump Sum Payment. If by that anniversary, Class 3 creditors are not paid in full with all applicable interest, then Sonja shall either seek to refinance the Manhattan Residence to pay any deficiency, or if that fails after a period of ninety (90) days, Sonja shall list the Manhattan Residence with a broker and pursue a private sale, to be completed within six months time. These

deadlines may be extended by the Court for cause after notice and hearing to all Class 3 creditors.

**Tax Exemption.** The Confirmation Order shall provide that consistent with the Supreme Court's interpretation of Section 1146(a) of the Bankruptcy Code (the "Section 1146(a) Exemption"), the transfer of any real property located in the United States in furtherance of the Plan shall be exempt from payment of all transfer and recording taxes and shall provide that the recorder of deeds or similar official shall accept such instrument for recording without requiring the payment of any filing fees, documentary stamp taxes or transfer taxes.

**Preservation of Avoidance Claims.** All rights conferred under Chapter 5 of the Bankruptcy Code, including the right to pursue objections and avoidance actions, are hereby preserved for Sonja's benefit. At this time, Sonja does not believe that there are any Chapter 5 avoidance claims to be pursued.

## **RETENTION OF JURISDICTION**

The Plan also provides that Bankruptcy Court shall retain jurisdiction to consider the following matters after Confirmation of the Plan:

(a) To enforce, implement, interpret or modify the Plan under applicable provisions of the Bankruptcy Code, including all motions and applications under 11 U.S.C. § 363(b), (f) and (h) to sell the Non-Manhattan Residence Assets and to adjudicate all proceedings in connection therewith;

(b) To hear and determine all controversies, claims, causes of action and objections that may be pending at the time of Confirmation;

(c) To retain such local and special counsel, and other professionals, as may be necessary to assist the Debtor in effectuating and implementing this Plan;

(d) To hear and determine all application for final compensation and reimbursement of expenses; and

(e) To ultimately enter a final decree closing the bankruptcy case based upon substantial consummation of the Plan.

## LEGAL REQUIREMENTS FOR CONFIRMATION OF THE PLAN

Section 1129(a) of the Bankruptcy Code sets forth a number requirements for confirmation of a Chapter 11 plan on a consensual basis. Many of these requirements are procedural and need not be repeated here, except to highlight the two most relevant elements:

Unless accepted by all classes,

(1) The Plan must be in the "best interests" of creditors – (i.e., the Plan must provide creditors with at least as much as they would receive if the debtor's case was converted to one under Chapter 7 of the Bankruptcy Code); and

(2) The Plan must be "feasible" (i.e., Sonja must demonstrate that she is capable of actually honoring the financial obligations under the Plan).

First, since the Plan provides that creditors will receive full payment of their allowed claims, with interest, a Chapter 7 liquidation will not provide a better recovery. To the contrary, the inability to confirm the Plan will unnecessarily delay distributions to

creditors and increase administrative costs and leave Sonja vulnerable to distressed sale values.

Second, the Plan is feasible because Sonja has recourse to several significant assets, including existing cash of $500,000, an award of $3 million from J.A. Morgan, and ownership of valuable real property in Colorado and France. Thus, although Sonja is seeking to defer the equity in her Manhattan Residence as a last resort, the Plan is still feasible.

## CONCLUSION

For all of the reasons set forth herein, Sonja requests that the Plan be confirmed and approved by the Bankruptcy Court.

Dated: New York, New York
August 26, 2011

| | |
|---|---|
| **GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP** <br> Attorneys for the Debtors <br> 1501 Broadway, 22nd Floor <br> New York, New York 10036 <br> Tel No.: (212) 221-5700 | Debtors: <br> **SONJA TREMONT-MORGAN** <br> **STAM LLC** |
| By: /s/ Kevin J. Nash, Esq. | By: /s/ Sonja Tremont-Morgan |