Robert N. Michaelson
The Michaelson Law Firm
11 Broadway, Suite 615
New York, NY 10004
Tel: 212.604.0685
Fax: 800.364.1291

and

Kenneth C. Greene
Hamrick & Evans, LLP
111 Universal Hollywood Drive Suite 2200
Universal City, CA 91608
Tel: 818.763.5292
Fax: 818.763.2308

*Attorneys Hannibal Pictures, Inc.*

Hearing Date: November 10, 2011
Hearing Time: 2:00 p.m.
Response Deadline: November 3, 2011

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re:                                                    Chapter 11

SONJA TREMONT-MORGAN *et al.*,                            Case No. 10-16132 (SCC)

                Debtors.            **SUBSTANTIVELY CONSOLIDATED**

----------------------------------------------------------

**MOTION OF HANNIBAL PICTURES, INC. FOR AN ORDER, PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE, CONVERTING DEBTORS' CASES OR, IN THE ALTERNATIVE, PURSUANT TO SECTION 1104 OF THE BANKRUPTCY CODE, APPOINTING A CHAPTER 11 TRUSTEE TO MANAGE DEBTORS' AFFAIRS**

Hannibal Pictures, Inc. ("Hannibal"), by its undersigned counsel, hereby moves this court for entry of an order, pursuant to Section 1112(b) of the United States Bankruptcy Code (11 U.S.C. §§ 101 *et seq.*) ("Bankruptcy Code"), converting the consolidated Chapter 11 case of Sonja Tremont-Morgan ("Tremont-Morgan"), an individual, and STAM, LLC ("STAM"), a limited liability company controlled by Tremont-Morgan, to one under Chapter 7 or, in the alternative, pursuant to Section 1104 of the Bankruptcy Code, appointing a Chapter 11 trustee to manage Debtors affairs, and respectfully represents as follows:

## BACKGROUND

1. Tremont-Morgan is a self-proclaimed "television personality" and a cast member of the television program *The Real Housewives of New York City*.

2. On November 17, 2010, Tremont-Morgan filed a Chapter 11 petition for relief with this Court for the stated purpose of staying enforcement of a final judgment ("Hannibal Judgment") dated September 1, 2009 against her in the principal amount of Six Million Eight Hundred Sixteen Thousand Two Hundred Ninety Four Dollars ($6,816,294) plus punitive damages of Two Hundred Fifty Thousand Dollars ($250,000), interest and costs in the matter of *Hannibal Pictures, Inc. v. Sonja Productions, Inc. and Sonja Tremont-Morgan* in the United States District Court for the Central District of California (Case No. CV-06-1814 WDK) ("California Action") to enable her to prosecute an appeal from the Hannibal Judgment.

3. On January 10, 2011, on the eve of a hearing in New York State Supreme Court, New York County, to consider a contempt motion brought by Hannibal against Tremont-Morgan and STAM for violation of a temporary restraining order entered on March 18, 2010 in connection with Hannibal's effort to collect the Hannibal Judgment, Tremont-Morgan caused STAM to file a Chapter 11 petition for relief with this court.

4. Tremont-Morgan's Schedules of Assets and Liabilities filed with her petition show assets of Thirteen Million Four Hundred Fifty Eight Thousand Seven Hundred and Forty Eight ($13,458,748) and liabilities of Nineteen Million Eight Hundred Thirty Seven Thousand and Five Hundred Dollars ($19,837,500). As set forth in the Plan of Reorganization filed herein by Hannibal ("Hannibal Plan"), Debtor's asset valuation is, upon information and belief, artificially deflated, and should in fact be in excess of Twenty Five Million Dollars ($25,000,000). Hannibal, upon

information and belief, submits that the within consolidated estate is presumptively solvent, as discussed in greater detail in the Hannibal Plan.

5. According to Tremont-Morgan's Schedules of Assets and Liabilities she holds a 99.6% interest in STAM.

6. The Schedules of Assets and Liabilities filed with the STAM petition list four assets including a townhouse located at 162 East 63rd Street, New York, New York 10065 which is Tremont-Morgan's personal residence and three bank accounts holding a total of One Million Six Hundred Sixty Three Thousand Eight Hundred and One Dollars ($1,663,801), and one liability, the Hannibal Judgment which is described as contingent, unliquidated and disputed, even though the Hannibal Judgment is a final judgment. Notably, each of these assets is also listed as an asset of Tremont-Morgan in her Schedules of Assets and Liabilities. In the Local Rule Affidavit filed with the STAM petition, Tremont-Morgan effectively concedes at Paragraphs 5 and 6 that these assets are in fact not her assets but rather assets of STAM and that the STAM petition was filed for the purpose of obtaining a stay of any effort by Hannibal to enforce the Hannibal Judgment against STAM and its putative assets. A copy of that Affidavit is annexed hereto as <u>Exhibit A</u>.

7. On March 29, 2011, the Tremont-Morgan and STAM Chapter 11 proceedings were substantively consolidated.

8. Upon information and belief, Debtors remain in possession of their assets and are operating their affairs as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

9. Upon information and belief, no creditors' committee has been appointed in this case.

10. Because the Hannibal Judgment was not stayed pending the outcome of the Appeal, on March 18, 2010, Hannibal commenced a turnover proceeding ("Turnover Proceeding") in the State Court against Tremont-Morgan, STAM, Sonja Productions, LLC, STAM Colorado, LLC, SCI STAM, Sonja II and Key Hedge Fund , LLC for the turnover of funds in satisfaction of the Hannibal Judgment.

11. On March 18, 2010, at the commencement of the Turnover Proceeding, and in order to preserve the *status quo* and prevent Tremont-Morgan and various entities under Tremont-Morgan's direct control (the "Tremont-Morgan Entities") from depleting or diverting assets, the State Court, at Hannibal's request, entered a temporary restraining order (the "TRO"), preventing Tremont-Morgan and the Tremont-Morgan Entities, including STAM, from transferring, selling, conveying, or utilizing any of their assets except for the payment of certain ordinary and customary living expenses of Tremont-Morgan (the "Permitted Expenses"). A copy of the TRO is annexed hereto as Exhibit B.

12. The TRO provided, in pertinent part, that pending a determination of the Turnover Proceeding:

> Respondents Sonja Tremont-Morgan, Sonja Productions, STAM LLC and Sonja II are enjoined from directly or indirectly removing, assigning, selling, disposing, pledging, mortgaging, transferring, hypothecating, utilizing or encumbering their Receiver Assets and any assets owned by Respondents Sonja-Tremont Morgan, Sonja Productions, STAM LL and Sonja II.

The TRO further provided in pertinent part, as follows:

> The temporary restraining order contained [in this Stipulation] is consented to by respondents Sonja Tremont-Morgan, Sonja Productions, STAM LLC and Sonja II, provided that Sonja Tremont-Morgan is allowed to pay for ordinary and customary living expenses of up to $45,000.[1]

---

[1] The Court subsequently instituted a downward modification of the $45,000 per month amount that Tremont-Morgan was allowed to spend on ordinary living expenses to $40,000 per month.

13. Through a series of transfers from on or about the date of the Hannibal Judgment, September 1, 2009, to March 8, 2010, Tremont-Morgan transferred at least Two Million Dollars ($2,000,000) to and from various bank accounts under her control until those funds eventually arrived at an account controlled by her at First State Bank, number 101007233 ("Account 233"). One day later, March 9, 2010, Tremont-Morgan withdrew One Million Seven Hundred Forty Nine Thousand Nine Hundred and Ninety Dollars ($1,749,990) from Account 233 and deposited those funds into another account controlled by her at First State Bank, number 10107225 ("Account 225"). A copy of the withdrawal and deposit slips reflecting this transaction is annexed hereto as Exhibit C.

14. On August 5, 2010, approximately five months after the TRO was issued. Tremont-Morgan flagrantly and maliciously disregarded the TRO by withdrawing One Million Five Hundred Fifty Six Thousand Six Hundred and Thirty Five Dollars ($1,556,635) from Account 225 and depositing those funds into an account controlled by STAM at First State Bank, number 10505576 ("Account 576"). Copies of the withdrawal and deposit slips reflecting this transaction are annexed hereto as Exhibit D.

15. Also on August 5, 2010, Tremont-Morgan again disregarded the TRO by withdrawing Two Hundred Fifty Thousand Seven Hundred and Twenty Six Dollars ($250,726) from Account 233 and depositing those funds into a money market account controlled by STAM at First State Bank, number 10505568 ("Account 568"). Copies of the withdrawal and deposit slips reflecting this transaction are annexed hereto as Exhibit E.

16. Additionally, in April 2010 and July 2010 Tremont-Morgan violated the TRO by withdrawing and spending Sixty Six Thousand Five Hundred and Ninety Six Dollars ($66,596) and Seventy Two Thousand Five Hundred and Ninety One Dollars ($72,591), respectively, from the restrained accounts which sums were in excess of the Permitted Expenses. Copies of the account statements for Account 225 for April 2010 and August 2010 reflecting these withdrawals are annexed hereto as Exhibit F.

17. The documentary evidence proving that Tremont-Morgan and STAM violated the TRO were obtained by Hannibal through subpoena of the applicable banks and other financial institutions.

18. There can be no genuine dispute that the transfers by Tremont-Morgan to STAM of One Million Eight Hundred Seven Thousand Three Hundred and Sixty Two Dollars ($1,807,362.02) were clear violations of the TRO and were done to prevent Hannibal from enforcing the Hannibal Judgment.

19. By order to show cause dated November 4, 2010, Tremont–Morgan and STAM were directed to appear before the State Court at a hearing scheduled for November 19, 2010 (the "Contempt Hearing"), to determine whether they should be held in contempt of Court and sanctioned for violating the TRO. A copy of that order to show cause together with a supporting affirmation from Hannibal's counsel in the Turnover Proceeding is annexed hereto as Exhibit G. The Contempt Hearing was adjourned to January 11, 2011, when on November 17, 2010, Tremont-Morgan filed her Chapter 11 petition. The Contempt Hearing was once again adjourned when, on January 10, 2011, Tremont-Morgan caused STAM to file its Chapter 11 petition.

20. Notably, the Local Affidavits filed with both the Tremont-Morgan and STAM petitions do not reference the Contempt Hearing and do not address, let alone deny, that Tremont-Morgan violated the TRO.

21. Notably, however, the commencement of this case did not deter Tremont-Morgan from continuing to transfer large amounts of money from one bank account to another. In addition, the Monthly Operating Reports are replete with questionable and contradictory entries. For example, Tremont-Morgan's 7/11 MOR's reflect that on July 1, 2011, Tremont-Morgan transferred the sum of Fifty Thousand Dollars ($50,000) from her STAM Debtor-in-Possession bank account to a Tremont-Morgan bank account. The MOR's further reflect that, on July 6, 2011, Tremont-Morgan transferred the sum of almost Sixty Thousand Dollars ($60,000) from her STAM Debtor-in-Possession bank account to a Tremont-Morgan bank account. See Tremont-Morgan Monthly Operating Report ("MOR") for period 7/1/11-7/31/11, a copy of which is annexed hereto as Exhibit H. The related STAM MOR for that period, however, reflects a transfer from Tremont-Morgan's Chase account (#920035565) in the amount of One Hundred Eight Thousand Nine Hundred Ninety Eight Dollars and One Cent ($108,998.01). A copy of the STAM MOR for the period 7/1/11-7/31/11 is annexed hereto as Exhibit I. Although the difference in the amounts reflected on the two MOR'S may be relatively negligible, the occurrence of these transfers, together with the inaccuracies in the MOR's, raise serious questions regarding Debtors' actions.

22. There is further evidence of disturbing misconduct. Tremont-Morgan's July 2011 MOR reflects an end-of-month ("EOM") cash balance of One Million Three Hundred Sixty Three Thousand Two Hundred and Ninety Two Dollars ($1,363,292). Her August 2011 MOR, a copy of which is annexed hereto as Exhibit J, reflects an EOM balance of approximately Eighty Six Thousand Four Hundred and Thirty Dollars ($86,430), a decrease of One Million Two Hundred

Seventy Six Thousand Eight Hundred and Sixty Two Dollars ($1,276,862)! The Cash Disbursements section of the August MOR show a "transfer to the STAM, LLC account" of Eight Nine Thousand Nine Hundred and Seventy Three Dollars ($89,973) which, although improper in itself, does not come close to explaining the disappearance of almost $1.3 million dollars. The mystery <u>may</u> be explained by reference to the STAM MOR's, which reflect an increase in the EOM balance from July to August of One Million Two Hundred Forty Two Thousand Three Hundred and Twenty Seven Dollars ($1,242,327). A copy of STAM's August 2011 MOR is annexed hereto as <u>Exhibit K</u>. Although that is more than a small discrepancy to arise in a period of one month, the bigger, more disturbing question is why Debtor is moving such large sums of money from account to account. Is it just a matter of time before this money is moved out of the DIP accounts, and beyond the purview of the estate?

23. The Tremont-Morgan and STAM MOR's are almost impossible to decipher. However, a few things are clear, and disturbing:

> 1) The cash in the bank accounts of the consolidated estates has decreased, over a period of approximately nine months, by Two Hundred Fifty One Thousand Four Hundred and Seventy One Dollars ($251,471). This, on an annualized basis, is a decrease of approximately Three Hundred Thirty Four Six Hundred and Sixty Six Dollars ($334,666) per year.
>
> 2) Though it is difficult to pinpoint the exact amount of income due to the numerous and disturbing transfers between accounts, it appears Tremont-Morgan's income over the nine month post-petition period, including support payments, was approximately Two Hundred Ninety Five Thousand Dollars ($295,000). Nonetheless, the amount of cash in the estate decreased, as discussed above, by Two

Hundred Fifty One Thousand Four Hundred and Seventy One Dollars ($251,471). This means Debtor spent, in nine months, Five Hundred Forty Six Thousand Four Hundred and Seventy One Dollars ($546,471). On an annualized basis, this represents expenditures in excess of Seven Hundred Fifty Thousand Dollars ($750,000).

3) Not surprisingly, a large percentage of these expenditure occurred by credit cards. In the nine month post-petition period, Debtor paid almost One Hundred Thousand Dollars ($100,000) to credit card companies. This, on an annualized basis, is approximately One Hundred Thirty Three Thousand Three Hundred Dollars ($133,300). Although the MOR's contain a "breakdown" of the credit card charges, the charges are not identified by payee or type of expense. Debtor might easily be hiding her profligate spending habits behind the mask of these exorbitant credit card payments.

Copies of the MOR's referenced in the preceding paragraphs are annexed hereto as Exhibit "L".

24. At a minimum, it seems certain that Debtor is incapable of managing her financial affairs during the pendency of this proceeding. For instance, Debtor's "payment by mistake" to Water Company, as reflected on the Tremont-Morgan July MOR, of Nineteen Thousand Seven Hundred and Ninety Dollars ($19,7900) is simply unbelievable. Of greater concern is the distinct possibility that these machinations reflect Debtor's intent to either confuse creditors or move assets beyond their reach in conduct tantamount to fraud. These recently, and belatedly, filed MOR's are perplexing and strongly signal trouble.

# REQUEST FOR RELIEF

25. The instant motion is made for cause, pursuant to 11 U.S.C. §1112(b) (4). It is based on subsections (A) the substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, and (B) the gross mismanagement of the estate. This is evidenced by both the pre-petition as well as post-petition conduct of Debtor.

26. Tremont-Morgan's flagrant, malicious and contemptuous pre-petition conduct in transferring and using assets in direct contravention of the TRO, followed by her post-petition transfers and machinations which are both inexplicable and vexing, strongly suggest both diminution and gross mismanagement of the estate. The unexcused and suspicious misrepresentations in her sworn Schedules of Assets and Liabilities concerning ownership of certain assets of STAM, and the confusing and contradictory information provided in her MOR's reinforce this contention.

27. The absence of a reasonable likelihood of rehabilitation is inherent in the barebones and patently inadequate Disclosure Statement and Plan of Reorganization ("<u>Debtors' Plan</u>") filed by Debtor. The Disclosure Statement does not contain even an iota of evidentiary support for the specious valuations upon which the Debtor's Plan ostensibly is based. Indeed, the absence of complete and accurate information regarding assets, liabilities, income and expenses seems the hallmark of these proceedings. Debtor's schedules are woefully inadequate and flawed. The MOR's are inaccurate. The Disclosure Statement is unsupportable. Moreover, despite repeatedly promising to do so, Debtor has failed to cooperate in allowing Hannibal to conduct any discovery whatsoever to enable it to reasonably formulate its own Plan.

28. Accordingly, ample grounds exist, in accordance with §1112(b) of the Bankruptcy Code, for conversion of this case. Minimally, the Court should appoint a trustee to manage Debtor's affairs pursuant to Section 1104 of the Code.

# ARGUMENT

## A.  Dismissal or Conversion Pursuant to Section 1112(b)

29. Section 1112(b) enumerates several examples of what constitutes "cause" to dismiss or convert a case, including the (i) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation, (ii) inability to effectuate a plan, or (iii) unreasonable delay by the debtor that is prejudicial to creditors. *See* 11 U.S.C. §§ 1112(b) (1), 1112(b) (2), 1112(b) (3).

30. A finding of "cause" is not limited to the grounds stated in Section 1112(b). *See* 11 U.S.C. § 102(3) (in construing the Bankruptcy Code, the terms "includes" and "including" are not limiting); *In re Tornheim*, 181 B.R. 161, 164-65 (Bankr. S.D.N.Y. 1996) (Bernstein, C.J.) (citations omitted) ("[t]he factors listed in Section 1112(b) are not exhaustive, and the . . . [t]he bankruptcy court can consider other factors that may arise, and use its equitable powers to reach a proper result").

31. Though not expressly enumerated in Section 1112(b), Courts commonly consider whether Debtor's bankruptcy petitions were filed in good faith in assessing whether "cause" exists to dismiss or convert a case. *See In re AdBrite Corp.*, 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003); *see also In re UNED Assocs., LLC*, 2007 Bankr. LEXIS 1467 at *6 (Bankr. S.D.N.Y. Apr. 20, 2007) ("It is well recognized that the Courts have implicit authority to dismiss a Chapter 11 petition as having been filed in bad faith.").

32. The filing of a Chapter 11 petition for the naked purpose of frustrating litigation in a non-bankruptcy forum is an act of bad faith and is a basis for conversion or dismissal. This is the holding *In re 15375 Memorial Corp. v. Bepco, L.P.* 589 F.3d 605 (3rd Cir. 2009) which affirmed a district court reversal of a bankruptcy court denial of a motion to dismiss and held that the filing of a bankruptcy petition that served no purpose other than to stay litigation is in fact a proper basis for

conversion or dismissal. Addressing Debtor's assertion that availing itself of the automatic stay was a legitimate purpose for a Chapter 11 filing, the Court stated:

> The protection of the automatic stay, however, is not *per se* valid justification for a Chapter 11 filing; rather, it is a consequential benefit of an otherwise good faith filing. As such, courts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation and any perceived benefit of the automatic stay, without more, cannot convert a bad faith filing to a good faith one. More generally, the desire to take advantage of the protections of the Code, such as the automatic stay of litigation outside of bankruptcy cannot establish *good* faith as a matter of law given the truism that every bankruptcy petition seeks some advantage offered in the Code and that any other rule would eviscerate any limitation that the good faith requirement places on Chapter 11 filings.

589 F.3d at 620 (citations omitted).

33. On a more specific level, it has been held that a Chapter 11 petition which, like Debtors' petitions, was filed for the purpose of avoiding a contempt judgment is an act of bad faith and cause for dismissal. *In re Chris-Marine U.S.A.*, 262 B.R.118 (Bankr. M.D. Fl. 2001).

> [A]n attempt by a Debtor to circumvent or escape the consequences of a contempt judgment issued by a court of competent jurisdiction was never a legitimate aim to be achieved by use of the rehabilitation provisions of [Chapter 11] and without doubt constitutes an impermissible use of Chapter 11 of the Bankruptcy Code.

262 B.R. at 124 (citations omitted).

34. In this instance it is clear that Debtors' petitions were not filed for a legitimate purpose; they were filed in consummate bad faith solely to frustrate Hannibal's ability to execute on the Hannibal Judgment and avoid an impending State Court finding of contempt based on Tremont-Morgan's gross and cynical violation of the TRO. In other words, Tremont-Morgan, on behalf of herself and STAM, is attempting to use the bankruptcy process for no other reason than to shield herself from her own bad conduct and frustrate Hannibal's legitimate effort to execute on the

Hannibal Judgment. The Debtors' Chapter 11 petitions serve no other purpose. Accordingly, in light of the established legal standards, this case should be converted.

35. Moreover, Debtor's flagrant and startling tendency to make enormous cash transfers, both before and after these proceedings were commenced militates in favor of conversion.

36. One final issue should factor into the Court's determination, namely, the cost of administering a liquidating Chapter 11 versus a Chapter 7.

> The Court agrees that an inquiry into the relative administrative costs is dispositive of the merits of conversion where, by all other indicia, the cases would proceed identically through liquidation under either Chapter. . . Nevertheless, *the relative administrative expenses under Chapter 11 versus Chapter 7 must be considered to decide whether the Conversion Motions make a sufficient showing under the "for cause" criterion of § 1112(b).*

*In re All American of Ashburn, Inc.* 40 B.R. 104 (Bank. Ct. Ga. 1984), [emphasis added] Although Debtor's Disclosure Statement and Plan are inadequate to meet the requirements of the Code, they do reveal the intention of Debtor to liquidate her assets in order to pay creditors in full. Indeed, 11 U.S.C. §1129(a)(7) mandates this course of action irrespective of Debtor's stated intention. The major difference between Debtor's Plan and Chapter 7 liquidation is that the latter liquidates the entirety of Debtor's estate, whereas Debtor would only liquidate her Manhattan property if sale of the other assets of the estate failed to yield adequate proceeds to pay creditors in full. This scenario is imaginary, nothing more than a hope and a prayer. Upon presentation of proper valuation evidence, it will become apparent that liquidation of all of the real property of the estate is the inevitable direction of these proceedings. As this becomes apparent, so does the high cost of a confirmation battle involving competing plans. It is submitted that Chapter 7 liquidation is cheaper, quicker, and the most appropriate manner in which to conclude these proceedings.

37. Section 1104 of the Bankruptcy Court provides in pertinent part:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest and after notice and a hearing, the court **shall** order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . .;
>
> (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate . . .; or
>
> (3) if grounds exist to convert or dismiss the case under Section 1112, but he court determines that the appointment of a trustee of examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1104(a) (emphasis added).

38. In accordance with the express language of Section 1104(a) (1), Courts have consistently held that "the appointment of a trustee is mandatory upon a determination of cause." *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998); *accord Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988).

39. Under Section 1104(a) (2), among the factors considered are (i) the trustworthiness of the debtor; (ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitations; (iii) the confidence – or lack thereof – of the business community and of creditors in current management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *In re Adelphia Communications Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006).

40. Applying those factors to the facts of this case, Tremont-Morgan, through her contemptuous and dishonest conduct, seems to have virtually invited this Court to appoint a trustee to manage the Debtors' affairs. First, she deliberately committed multiple flagrant and material violations of the TRO. Second, she caused the Debtors' petitions to be filed for no other purpose

than to avoid having to answer to the State Court for her contemptuous conduct. Third, it seems likely that she made intentional misrepresentations in her Schedules of Assets and Liabilities concerning the ownership of bank accounts used to improperly shield her assets from Hannibal in violation of the TRO. Fourth, her Monthly Operating Reports reveal that she continues to transfer funds in a manner which can only be described as suspicious. Fifth, the MOR's contain incomplete and contradictory information. Sixth, the Disclosure Statement and Plan are devoid of substance, and suggest that they were filed to placate the Court's insistence that Debtor move the case along, but with no ability or intent to confirm a Plan around these specious pleadings. Seventh, Debtor refuses to cooperate in scheduling a Rule 2004 exam, which would enable creditors to (1) determine the adequacy (or inadequacy) of her Disclosure Statement and Plan; (2) move forward with a competing Plan; and (3) enable the Court to determine whether cause for conversion does in fact exist.

41. Courts often direct the appointment of Chapter 11 trustees for debtor conduct that is similar to the conduct exhibited by Tremont-Morgan. *See e.g. In re Lowenschuss*, 171 F.3d 673 (9th Cir. 1999) *cert den.* 528 U.S. 877, 120 S.Ct. 185, 145 L.Ed. 156 (1999) (affirming appointment of Chapter 11 trustee based on debtor's improper pre-petition transfer of assets); *Tradex Corp. v. Morse*, 339 B.R. 823 (D. Mass. 2006) (affirming appoint of Chapter 11 trustee for dishonesty in schedules filed with court); *In re Intercat, Inc.*, 247 B.R. 911 (Bankr. S.D. Ga. 2000) (appointing Chapter 11 fraud for dishonesty). Of particular note is *In re Rivermeadows Associates, Ltd.*, 185 B.R. 615 (Bankr. D. Wyo. 1995) wherein a Chapter 11 trustee was appointed because the debtor, like Tremont-Morgan, disregarded court orders.

42. Simply stated, Tremont-Morgan's manifest bad conduct has created a powerful basis to conclude that she cannot be relied on or trusted to properly discharge the duties of a debtor-in-

possession in an honest and proper manner. Given the compelling evidence supporting this conclusion and the precedent cited, Hannibal submits that under the mandatory language of Section 1104 this Court, if it does not convert the Debtor's case, must appoint a trustee to manage her affairs.

43. A prior request for this relief was made by Hannibal on January 20, 2011 though, obviously, the prior motion was based upon the facts known at that time. The prior motion was denied. This motion, on the other hand, is based on both the facts, as Hannibal knew them, on January 20, 2011, as well as facts which have arisen in the past ten months.

**WHEREFORE**, Hannibal requests entry of an order (i) pursuant to Section 1112(b) of the Bankruptcy Code converting Debtors' case to one under Chapter 7 or (ii), in the alternative, pursuant to Section 1104 of the Bankruptcy Code, appointing a trustee to manage the Debtors' affairs and (iii) providing such other relief as is just.

Dated: October 18, 2011

    Respectfully submitted,

    The Michaelson Law Firm
    11 Broadway, Suite 615
    New York, New York 10004
    Tel: 212.604.0685
    Fax: 800.364.1291

    /s/ *Robert N. Michaelson*
    Robert N. Michaelson

    and

    Kenneth C. Greene
    Hamrick & Evans, LLP
    111 Universal Hollywood Drive Suite 2200
    Universal City, CA 91608
    Tel: 818.763.5292
    Fax: 818.763.2308

    *Attorneys for Hannibal Pictures, Inc.*